Thomas G. BROWNELL, Barrell of Dolls Saloon, Inc., Plaintiffs,

v.

CITY OF ROCHESTER, New York, Defendant.

Chuck Zicari, C & A Playmates, Inc., Plaintiffs,

v.

City of Rochester, New York, Defendant.

S.J.G. of Rochester, Inc., d/b/a Mirage, Plaintiff,

v.

City of Rochester, New York, Defendant.

Nos. 00–CV–6597L, 00–CV–5698L, 01–CV–6012L.

United States District Court, W.D. New York.

May 14, 2001.

David Brickman, Albany, NY, for Thomas G. Brownell, Barrell of Dolls Saloon, Inc.

Linda S. Kingsley, Rochester, NY, Jeffrey P. Eichner, Rochester, NY, for City of Rochester.

## DECISION AND ORDER

LARIMER, Chief Judge.

This litigation once again compels a federal court to deal with an activity—nude barroom dancing—that is repugnant to a large segment of the community. No doubt in response to that sentiment, the City of Rochester, like other municipalities, has enacted an ordinance ("the Ordinance") which restricts the type of conduct at establishments providing such entertainment. The Ordinance also imposes exhaustive licensing requirements for those who would operate and perform in such emporia.

The unpopularity of such activity, however, has never been the litmus test for

determining whether that activity should be banned. The First Amendment of the United States Constitution was adopted to guarantee that the government could not abridge the expression and presentation of unpopular ideas. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

A newcomer to the dispute over barroom nude dancing might well express skepticism that such activity is covered by the First Amendment at all. Although debates about the morality or social acceptability of nude dancing and other "adult" entertainment will likely continue for many years to come, as a matter of constitutional law the matter largely has been put to rest. The United States Supreme Court has established that such activity, provided that it is not obscene, constitutes expressive conduct that is entitled to protection under the First Amendment. The expressive conduct is an erotic one which, by its nature, may be troubling to a segment of the populace. No matter how tasteless such performances may appear to many, until the United States Supreme Court changes its view, such dancing is entitled to protection under the First Amendment. If the principles set forth in the First Amendment are to survive, then it is precisely those ideas and beliefs which claim the fewest adherents, and which large segments of society find the most

offensive, that are in the greatest need of the bulwark of the First Amendment.

Although the dance may be tasteless and indecent to many, like other "unpopular" speech (whether written, spoken or performed) it is entitled to its place, albeit a modest one, in the marketplace of ideas. The Court's task is not to determine the morality, tastefulness or artistic merits of the conduct at issue. The issue before me is simply whether the City's regulation of conduct that all sides agree is constitutionally protected runs afoul of the First Amendment.

After careful review, I find that portions of the Ordinance violate the First Amendment and must be struck down as unconstitutional. Therefore, plaintiffs' motion for an injunction enjoining the City from enforcing the Ordinance is granted in part.

## FACTUAL BACKGROUND

These three actions have been brought by three adult entertainment businesses in the City of Rochester, New York ("the City"), and their owners, challenging the Ordinance adopted by the City on September 22, 2000. The Ordinance, most of which took effect on January 31, 2001,[1] amends the City's Municipal Code by, *inter alia*, adding a new chapter ("Chapter 98") that provides for the licensing and regulation of sexually oriented businesses within Rochester. Plaintiffs, who are all represented by the same attorney and whose complaints are virtually identical,[2] have sued the City under 42 U.S.C. §§ 1983, 1985 and 1988, alleging that the Ordinance violates their rights under the

1. One section dealing with "Body Rub Parlors" (which is not at issue in these actions), took effect on January 1, 2001. In addition, counsel for the City stated at oral argument that until the court decides the pending motions for a preliminary injunction, the City has agreed not to enforce the licensing-related

sections of the Ordinance, which are being challenged here.

2. By Decision and Order entered on January 30, 2001, the court consolidated all three cases for purposes of deciding the pending motions for a preliminary injunction.

First, Fourth, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution. Simultaneously with the commencement of the actions, plaintiffs also moved for a preliminary injunction enjoining defendant from enforcing Chapter 98.

The Ordinance (Appendix A to this Decision and Order) states that its purpose is to regulate sexually oriented businesses in the City in order to address certain undesirable "secondary effects" associated with such businesses. Those secondary effects generally include crime (such as prostitution), health concerns (such as the transmission of sexually transmitted diseases), and the downgrading of property values in areas near sexually oriented businesses.

Section 98–3 of the Ordinance sets forth four types of sexually oriented businesses for which licenses are required, the most pertinent to these actions being "adult cabaret," which is defined as "a business enterprise which regularly features or offers to the public, customers or members, performances by persons who appear nude or semi-nude or live performances that are characterized by their emphasis on the exposure, depiction or description of specified anatomical areas[3] or the conduct or simulation of specified sexual activities."[4] The Ordinance makes it unlawful for anyone to operate a sexual-

ly oriented business, or to work or perform, or to allow any employee to work or perform, nude or semi-nude at a sexually oriented business, without a valid license. Ordinance § 98–4(A).

The Ordinance sets forth a number of requirements for issuance of a sexually oriented business license, as well as various items of information that must be supplied by the applicant, including the applicant's name and address, whether the applicant has been convicted of certain crimes, partnership or corporate information, if applicable, etc.

The Ordinance makes the Chief of Police ("the Chief") the issuing authority for sexually oriented business licenses. Upon the filing of an application for a sexually oriented business license, an investigation is to be performed within thirty days by certain City agencies to determine compliance with the Ordinance and applicable zoning, fire, and property codes. Upon conclusion of the investigation, the Chief must issue the license unless one or more disabling conditions (*e.g.*, conviction of one of the specified crimes) are found to exist.

The Ordinance states that "[d]eterminations resulting from a person's background, or activities at a sexually oriented business, with respect to the denial, suspension, or revocation of a license, which incidentally burden free expression, shall

3. "Specified anatomical areas" is defined as "any showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the female breast with less than a full opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state."

4. "Specified sexual activities" is defined as actual or simulated acts of masturbation, sexual intercourse, oral or anal copulation or sadomasochism; fondling or other erotic touching of or physical contact with one's own or another's genitals, pubic area, but-

tocks or female breasts, whether clothed or unclothed; human male or female genitals when in a state of sexual stimulation or arousal; or excretory functions or acts with animals as part of or in conjunction with any of the activities set forth herein. Activities which are commonly referred to by the slang terms "lap dance," "straddle dance," "face dance" or "table dance" shall be included in this definition. For purposes of this definition, "sadomasochism" means infliction of pain, flagellation or torture, or the condition of being bound, fettered or otherwise physically restrained.

be no broader than needed to achieve City goals." Ordinance § 98–17. The Ordinance further provides that upon denial, suspension or revocation, "the applicant or licensee may seek prompt judicial review of such administrative action pursuant to Article 78 of the [New York] Civil Practice Law and Rules." The denial, suspension or revocation "shall be stayed for a period of twenty (20) days and, if a proceeding is brought to challenge the administrative action, throughout the pendency of the proceeding in the trial court. The administrative action shall be promptly reviewed by the court." Ordinance § 98–19.

The Ordinance then goes on to set forth additional regulations relating to activities on the premises of sexually oriented businesses, which affect customers and performers alike. These include a proscription of certain "specified sexual activities," a requirement that performers be on a stage at least eighteen inches above the floor and at least six feet from the nearest customer, a prohibition of physical contact between performers and customers, etc. Ordinance § 98–21.

Section 98–28 provides that the "Municipal Code Violations Bureau shall hear and determine charges involving violations of this chapter. Any person who violates this chapter shall be subject to the penalties set forth in Section 13A–11G of the Municipal Code." The latter section provides for fines ranging from $100 for a first offense to $300 for third and subsequent offenses, with additional penalties of double those amounts upon default.

As stated, plaintiffs in the instant cases are all sexually oriented businesses and their owners. In addition, two of the individual plaintiffs, Thomas G. Brownell and Dennis S. Giunta, are alleged to be managers of their sexually oriented businesses. The sexually oriented businesses in these actions fall within the Ordinance's definition of "adult cabarets," *i.e.*, they all feature live nude or semi-nude entertainers.

Plaintiffs contend that the Ordinance constitutes an impermissible prior restraint on the exercise of their rights under the First Amendment. In particular, plaintiffs challenge several aspects of the licensing system: the requirement that information on the license application be given under oath; the Chief's discretion to determine if any information on the application is false; and the nature of the information required to be provided, much of which plaintiffs contend is sensitive in nature and irrelevant to any legitimate interests of the City. Plaintiffs further argue that requiring applicants to provide information about such matters as their criminal records will have a chilling effect on persons who would like to obtain a sexually oriented business license. In addition, plaintiffs contend that many of the restrictions on performers' actions while on stage impermissibly restrict their freedom of expression under the First Amendment.

## DISCUSSION

### I. Standing

The first issue that must be addressed is one of standing. The City contends that plaintiffs lack standing, especially relating to the licensing process. The City points out that plaintiffs have not yet submitted license applications pursuant to the Ordinance, or been denied a license, nor do they contend that they would be subject to denial under the Ordinance. In addition, the court was concerned about whether these plaintiffs could assert First Amendment claims on behalf of the performers who work at the plaintiff businesses, none of whom is a party to any of these actions. The court raised this issue *sua sponte*, since "[t]he federal courts are under an independent obligation to exam-

ine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.' " *United States v. Hays,* 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (quoting *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 230–231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (citations omitted)).

I conclude that plaintiffs have demonstrated the requisite standing to challenge the Ordinance. First, as to the licensing aspects, the Supreme Court has "long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." (*City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)). *See, e.g., Genusa v. City of Peoria,* 619 F.2d 1203, 1218 (7th Cir.1980) (plaintiff owners had standing to challenge disabling provision based on prior criminal convictions, "even absent allegations that licenses would be denied to any plaintiff owner because of the provisions," since provision "would make it more difficult for the owners to sell their interests in their adult bookstores, would present a continuing threat of loss of license in the event of future conviction of one of the specified offenses, and would subject the owners to ... investigative and information disclosure requirements"); *Baby Dolls Topless Saloons, Inc. v. City of Dallas,* 114 F.Supp.2d 531, 542 (N.D.Tex. 2000); *Jersey's All–American Sports Bar, Inc. v. Washington State Liquor Control Bd.,* 55 F.Supp.2d 1131, 1136 (W.D.Wash. 1999) ("There is no dispute that the plaintiff's activities render it subject to the permitting scheme at issue.... Thus, the Court finds that the plaintiff has standing to bring this facial challenge and proceeds to consider the merits of its claims"); *Ohio*

*Citizen Action v. City of Avon Lake,* 986 F.Supp. 454, 459 (N.D.Ohio.1997); *Natco Theatres, Inc. v. Ratner,* 463 F.Supp. 1124, 1126–27 (S.D.N.Y.1979).

■ Moreover, plaintiffs' claims are based not just on the possibility that they may be denied licenses, but on the information required by the application itself. Plaintiffs allege that the required information is not reasonably related to any legitimate governmental interest, and that they should not be required to provide that information in the first place. *See Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("compelled disclosure, in itself, can seriously infringe on the privacy of association and belief guaranteed by the First Amendment"). For example, the Ordinance provides for denial of a license if the applicant is found to have been convicted of any of a number of specified offenses. Plaintiffs do not allege that they have been convicted of any of those offenses. If they were only challenging the disabling provision itself, they might lack standing to bring their claim. *See FW/PBS,* 493 U.S. at 234, 110 S.Ct. 596 (to establish standing to challenge provision disabling an applicant who has been convicted of any of certain enumerated crimes within a certain period of time, plaintiff must show both (1) conviction of one or more of the enumerated crimes, and (2) that the conviction or release from confinement occurred recently enough to disable the applicant under the ordinance).

As stated, however, plaintiffs also assert that it is a violation of their rights simply to be required to disclose much of this information. They contend that much of the information required on the application form is not relevant to any legitimate interests that the City may have with respect to regulating sexually oriented businesses, and that required disclosure of this

information is intrusive, unnecessary and would tend to have a chilling effect on the exercise of First Amendment rights by persons who wish to obtain a license to operate or perform in a regulated establishment.

The merits of this claim are also intertwined to a great extent with the underlying issue of whether the disabling requirements are themselves valid. Although the range and types of information required do not correspond in every particular with the disabling factors, many of them do correspond; for example, the Ordinance requires that the applicant state whether he has ever been convicted of one or more specified crimes, and it also makes conviction of any of those crimes grounds for denial of a license. Ordinance §§ 98–5(D)(3), 98–10(A)(3). If, as a constitutional matter, the City cannot deny a license based solely on such a conviction, then requiring such information would be unlikely to serve any legitimate purpose, and could constitute a violation of the applicant's privacy.

I therefore conclude that plaintiffs do have standing to challenge the disclosure requirements, even if they lack standing to challenge the disabling provisions directly. *See Genusa*, 619 F.2d at 1216 (corporation and corporate officer had standing to challenge disclosure requirements that applied to officers, directors, and stockholders of a corporate applicant). Because the two issues are so closely related, however, evaluation of plaintiffs' challenge to the disclosure requirements will necessitate consideration of the validity of the disabling provisions as well. *See Ellwest Stereo Theater, Inc. v. Boner*, 718 F.Supp. 1553, 1568 (M.D.Tenn.1989) (striking down, without discussing issue of standing, criminal disclosure requirement on ground that disabling provision based on prior felony conviction was unconstitutional).

■ I also determine that plaintiffs have standing to assert First Amendment claims with respect to enforcement of the Ordinance's restrictions on activities inside sexually oriented businesses. Although plaintiffs are owners and not the performing artists, they nonetheless have sufficient interest to challenge the Ordinance. *See, e.g., Leverett v. City of Pinellas Park*, 775 F.2d 1536, 1539 (11th Cir.1985) (in suit by corporation and its owners challenging city ordinances prohibiting nudity in commercial establishments under certain circumstances, plaintiffs' "direct, authentic and continuing interest" in offering nude dancing at plaintiffs' nightclub led court to find that plaintiffs had standing to sue); *Howard v. City of Jacksonville*, 109 F.Supp.2d 1360, 1362 (M.D.Fla.2000) ("The nude dancing and adult media offered by Plaintiff [at its lounge] are claimed to be non-obscene, constitutionally-protected communication. Accordingly, [plaintiff] ha[s] standing to make this constitutional challenge" to ordinance imposing moratorium on issuance of adult entertainment licenses); *J.L. Spoons, Inc. v. City of Brunswick*, 49 F.Supp.2d 1032, 1042 (N.D.Ohio 1999) ("J.L. Spoons has persuasively argued that the prohibitions in [a section of an ordinance regarding the conduct of employees and patrons in sexually oriented businesses] directly impinge its own First Amendment rights, as it sponsors the very performances that the section is designed to regulate"); *Santa Fe Springs Realty Corp. v. City of Westminster*, 906 F.Supp. 1341, 1352–53 (C.D.Cal.1995) (corporate plaintiff, which operated topless bar, had standing to challenge conditional use permit ordinance, in part because plaintiff would be prohibited from engaging in protected First Amendment activity if its adult cabaret were closed). In addition,

while persons to whom a statute may be constitutionally applied normally lack standing to argue that a statute is unconstitutional if applied to persons or situations *not* before the court, *see Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), an exception to that rule applies when the plaintiff can show that "(1) it faces a threat of actual injury such that it has a sufficiently concrete interest in the controversy; (2) it has a close relationship with the third party; and (3) there is some hindrance to the third party's ability to protect his or her own interests." *J.L. Spoons,* 49 F.Supp.2d at 1042 (citing *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)).

Plaintiffs have made such a showing in the cases at bar. Although they are not performers, plaintiffs have some First Amendment rights of their own that are implicated here, inasmuch as they present the performances that the Ordinance is designed to regulate. *Id.* As for the performers themselves, their First Amendment interests in these cases is "virtually identical" to that of plaintiffs, *id.* at 1043; *see also Hang On, Inc. v. City of Arlington,* 65 F.3d 1248, 1252 (5th Cir.1995) (holding that plaintiff corporation that operated topless bar had standing to challenge "no touch" provision as violative of First Amendment rights of its employees and customers, in part because "there [wa]s no indication that Hang On's interest in this litigation diverge[d] from that of its dancers"), and they, like plaintiffs, also have a financial stake in the outcome of these actions, since one of the provisions of the Ordinance prohibits performers from soliciting tips during their performances. *See Hang On,* 65 F.3d at 1252 ("Significantly, Arlington cannot dispute that its ordinance has a direct financial impact on Hang On, as well as Hang On's employees. Injury is essential to meeting the thresh-

old case or controversy requirement of Article III, and injury of this type is usually a component of a relationship sufficiently 'close' to meet prudential standing requirements"). I conclude, therefore, that plaintiffs do have standing to bring these actions.

## II. Preliminary Injunctions–General Standards

■ "A party seeking a preliminary injunction must demonstrate '(1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief.'" *N.A.A.C.P., Inc. v. Town of East Haven,* 70 F.3d 219, 223 (2nd Cir.1995) (quoting *Resolution Trust Corp. v. Elman,* 949 F.2d 624, 626 (2d Cir.1991)). The "'serious questions' prong is also frequently termed the 'fair ground for litigation' standard." *East Haven,* 70 F.3d at 223.

The Second Circuit has stated that "'[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.,* 719 F.2d 42, 45 (2d Cir.1983) (quoting 11A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure, § 2948 at 431 (1973) (footnote omitted)). *Accord Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990). Whether a particular harm is irreparable turns on its imminence and the lack of an adequate remedy at law. *See Reuters,* 903 F.2d at 907 (citations omitted) ("Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must

be one incapable of being fully remedied by monetary damages"). Finally, "[i]n making the determination of irreparable harm, both harm to the parties and to the public may be considered." *Long Island R.R. Co. v. International Ass'n of Machinists*, 874 F.2d 901, 910 (2d Cir.1989), *cert. denied*, 493 U.S. 1042, 110 S.Ct. 836, 107 L.Ed.2d 831 (1990).

■ As for the second prong of the standard for issuance of injunctive relief, where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard, and should grant the injunction only if the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim. *Charette v. Town of Oyster Bay*, 159 F.3d 749, 754 (2d Cir.1998); *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989).

Although a court deciding a motion for a preliminary injunction must conduct a hearing if any essential facts are in dispute, *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir.), *cert. dismissed*, 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989); *Fengler v. Numismatic Americana, Inc.*, 832 F.2d 745, 747 (2d Cir.1987), no hearing is necessary if the facts are undisputed or if a hearing would not yield additional pertinent information. *Charette*, 159 F.3d at 755; *United States v. Ianniello*, 824 F.2d 203, 207 (2d Cir.1987); *Herbert Rosenthal Jewelry Corp. v. Grossbardt*, 428 F.2d 551, 554–55 (2d Cir.1970) ("not every application for a preliminary injunction require[s] an evidentiary hearing"). Rather, " 'there is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it.' " *Consolidated Gold Fields PLC*, 871 F.2d at 256 (citation omitted).

In addition, "[w]here a party against whom an injunction is sought is 'demonstrably "content to rest" on affidavits submitted to the court,' no evidentiary hearing is necessary." *Benten v. Kessler*, 799 F.Supp. 281, 283 n. 1 (E.D.N.Y.1992) (quoting *Fengler*, 832 F.2d at 748); *Association of Flight Attendants v. United Airlines*, 797 F.Supp. 1115, 1117 n. 2 (E.D.N.Y.), *rev'd on other grounds*, 976 F.2d 102 (2d Cir.1992). Here, counsel from both sides agreed at oral argument that the relevant facts are not in dispute, and that the court need not hold a hearing before deciding plaintiffs' motions.

I agree that no hearing is necessary here. The essential facts of these cases are not in dispute. In addition, the challenges to the Ordinance are not based on the particular circumstances under which the Ordinance is to be applied to plaintiffs, or on any facts peculiar to these plaintiffs; rather, plaintiffs contend that the Ordinance is unconstitutional on its face. There is also no dispute that the plaintiffs and the sexually oriented businesses that they own and operate are covered by and subject to the Ordinance. Indeed, even the existence of the so-called "secondary effects" that the Ordinance is ostensibly intended to combat has not been disputed by plaintiffs, at least for purposes of the pending motions; *see* Plaintiffs' Memorandum of Law at 14 (noting that "[z]oning has been upheld as justified to control adverse secondary effects which have been found to accompany adult uses").

### III. Irreparable Harm

■ "In the context of a motion for a preliminary injunction, '[v]iolations of First Amendment rights are commonly considered irreparable injuries.' " *Charette*, 159

F.3d at 755 (quoting *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir.1996), *cert. denied*, 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997)). Therefore, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Bery*, 97 F.3d at 694 (quoting 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948, at 440 (1973)); *accord Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984); *see also Scelsa v. City Univ. of New York*, 806 F.Supp. 1126, 1135 (S.D.N.Y.1992) ("The law in this Circuit is that a constitutional deprivation constitutes per se irreparable harm"); *Gour v. Morse*, 652 F.Supp. 1166, 1173 (D.Vt.1987) ("Constitutional rights are so basic to our society that their deprivation is almost by definition irreparable"). In addition, "it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm." *Jolly v. Coughlin*, 76 F.3d 468, 482 (1996).

Plaintiffs contend that they have shown irreparable harm because the loss of First Amendment rights, even for brief periods, is *per se* irreparable harm. Defendant does not directly address that issue, instead basing its arguments on its contention that plaintiffs have not shown a likelihood of success on the merits.

There is case authority supporting plaintiffs' position. *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Since plaintiffs have alleged a deprivation of their First Amendment rights, and since the chief dispute here appears to be whether plaintiffs are likely to succeed on their claims challenging the Ordinance, I find that plaintiffs have sufficiently alleged irreparable harm

for purposes of their motions for a preliminary injunction.

## IV. Likelihood of Success on the Merits

### A. Regulation of Nude Dancing and Similar Activity–Constitutional Considerations

As stated, the Ordinance covers a range of activities involving nude and semi-nude entertainers. Attempts to regulate, and in some cases ban altogether, such activity have generated an abundance of case law in recent years. These cases have established a number of broad principles, the application of which to specific factual situations has yielded varying results.

■ "Although once furiously debated, it is now well-established that [non-obscene nude dancing] enjoys constitutional protection as expressive conduct." *Schultz v. City of Cumberland*, 228 F.3d 831, 839 (7th Cir.2000) (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000)); *accord Charette*, 159 F.3d at 753 (citing *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion)); *see also Sable Communications v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) ("Sexual expression which is indecent but not obscene is protected by the First Amendment"). At the same time, however, "nude dancing and erotic materials are not accorded the full spectrum of First Amendment protection." *T & A's, Inc. v. Town Bd. of the Town of Ramapo*, 109 F.Supp.2d 161, 169 (S.D.N.Y. 2000). *See, e.g., Barnes*, 501 U.S. at 566, 111 S.Ct. 2456 ("nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so") (plurality opinion); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 70, 96 S.Ct. 2440, 49 L.Ed.2d

310 (1976) ("society's interest in protecting [erotic] expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate"); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) ("the customary 'barroom' type of nude dancing may involve only the barest minimum of protected expression").

■ What this means is that nude dancing can constitutionally be regulated-to a greater degree, perhaps, than many other expressive activities-but only within certain limits. Indeed, plaintiffs concede that municipalities can lawfully enact regulations that apply only to adult uses. Such regulations are generally permissible as long as they are aimed not at suppressing or restricting free expression, but at curbing undesirable secondary effects associated with such businesses. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

The Supreme Court has set forth two similar, but not identical, tests that have been applied in cases involving governmental regulation of sexually oriented businesses. The first of these is the "time, place, or manner" test that the Court employed in *Renton,* which involved a zoning ordinance that prohibited adult motion picture theaters from locating within 1000 feet of any residential zone, dwelling, church, park or school.

■ The *Renton* test was summarized by the Second Circuit in *Charette.* First, "[m]unicipal 'regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment.'" *Charette,* 159 F.3d at 754 (quoting *Renton,* 475 U.S. at 46–47, 106 S.Ct. 925). "Content-neutral" time, place, and manner regulations are permissible, however, so long as they (1) are designed to serve a substantial govern-

mental interest; and (2) do not unreasonably limit alternative avenues of communication. *Id.* (citing *Renton,* 475 U.S. at 47, 106 S.Ct. 925). In particular, zoning ordinances designed to combat the undesirable secondary effects of sexually oriented businesses are to be reviewed under the standards applicable to such content-neutral time, place, and manner regulations. *Id.* Accordingly, "the appropriate inquiry in such cases is 'whether the [municipal] ordinance is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication.'" *Id.* (quoting *Renton,* 475 U.S. at 50, 106 S.Ct. 925) (brackets in original).

■ A second test often utilized in this context is the four-part test laid out in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). This test has been used to analyze the constitutionality of government regulation of expressive conduct, that is, conduct that contains both "speech" and "nonspeech" elements. *Id.* at 376, 88 S.Ct. 1673. Under *O'Brien,* a governmental regulation of such conduct is sufficiently justified if: it is within the constitutional power of the government; it furthers an important or substantial governmental interest; the governmental interest is unrelated to the suppression of free expression; and the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *Id.* at 376–77, 88 S.Ct. 1673. Thus, in *O'Brien,* the Court held that a prohibition against mutilation of draft cards, which was intended to further the administration of the Selective Service System, met these requirements and could constitutionally be applied against one who publicly burned his draft card, even though he claimed to have done so as a symbolic protest.

The Supreme Court has since applied the *O'Brien* test in cases involving regulation of nude dancing and similar activities. *See, e.g., Erie,* 529 U.S. at 296, 120 S.Ct. 1382; *Barnes,* 501 U.S. at 561, 111 S.Ct. 2456. The question, then, is which test-the "time, place and manner" test of *Renton,* or the four-part *O'Brien* test-should be applied in the instant case.

While the Supreme Court has observed that the expressive-conduct test of *O'Brien* and the "time, place, or manner" test of *Renton* "embody much the same standards," *Barnes,* 501 U.S. at 566, 111 S.Ct. 2456 (plurality opinion); *see also Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 298, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (*O'Brien*'s four-part test, "in the last analysis, is little, if any, different from the standard applied to time, place, or manner restrictions"), the two tests may not necessarily be identical. In *Ward v. Rock Against Racism,* 491 U.S. 781, 800, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), a "time, place, or manner" case, the Court said that the means chosen are narrowly tailored as long as they are "not substantially broader than necessary to achieve the government's interest." In *O'Brien,* on the other hand, the Court said that regulation of expressive conduct may be *"no greater than is essential* to the furtherance of [the government's] interest." 391 U.S. at 377, 88 S.Ct. 1673 (emphasis added). In *Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358, 1364 (11th Cir.1999), the Eleventh Circuit stated that although "[t]he Court is surely right to suggest that these tests are generally the same[,] ... in the occasional case, there may be a difference between 'not substantially broader' and 'no greater than is essential.' Although it may frequently have no effect on the outcome, then, it is still necessary to decide which test to apply in any given case, since the approach

to the relevant issues is slightly different under the two standards. *Id.*

 In the case at bar, I believe that many of the Ordinance's provisions must be analyzed under the four-part *O'Brien* test. For one, the Ordinance's restrictions on performers' activities inside sexually oriented businesses clearly amounts to a direct regulation of expressive conduct, insofar as it seeks to restrict the manner in which the performers attempt to convey an erotic message through their performances. *Id.* I also note that while some of the acts constituting "specified sexual activities" could constitute "pure," or nonexpressive, conduct, the definition of "specified sexual activities" includes "erotic touching" of certain parts of the body. The implication of this language seems to be that touching certain parts of the human anatomy is permitted, but only if the touching is not "erotic." Plainly, then, it is not merely the *act* of touching that is prohibited, but touching in a way that conveys a message of eroticism.

 On the other hand, as to some of the other parts of the Ordinance relating to activities inside sexually oriented businesses-generally, those concerning physical contact between performers and customers, requirements concerning the stage on which dancers perform, payment of tips and so on-I believe that those provisions should be analyzed under the "time, place and manner" test of *Renton.* On their face, these provisions impose restrictions on certain types of conduct, irrespective of whether that conduct contains any expressive elements, and the applicability of those provisions is not in any way dependent on the expressive conduct of the performers. *See, e.g., Colacurcio v. City of Kent,* 163 F.3d 545, 553–55 (9th Cir.1998), *cert. denied,* 529 U.S. 1053, 120 S.Ct. 1553, 146 L.Ed.2d 459 (2000); *BSA, Inc. v. King County,* 804 F.2d 1104, 1111 (9th Cir.1986).

■ The licensing aspects of the Ordinance are subject to a somewhat different analysis. As explained by the Supreme Court in *FW/PBS*, 493 U.S. 215, 110 S.Ct. 596, a licensing system that in effect requires government approval before one may engage in activity protected by the First Amendment is to be treated as a prior restraint, and as such, it will be invalidated if the court finds either of "two evils that will not be tolerated in such schemes." *Id.* at 225, 110 S.Ct. 596. First, "a scheme that places 'unbridled discretion in the hands of a government official or agency'" amounts to unconstitutional censorship. *Id.* at 225–26, 110 S.Ct. 596 (quoting *Lakewood*, 486 U.S. at 757, 108 S.Ct. 2138).

"Second, a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible." *Id.* at 226, 110 S.Ct. 596 (citing *Freedman v. Maryland*, 380 U.S. 51, 59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)). A majority of the Court in *FW/PBS* held that a scheme for licensing businesses that purvey sexually oriented speech requires at least two procedural safeguards: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; [and] (2) expeditious judicial review of that decision must be available ...." *Id.* at 227, 110 S.Ct. 596 (plurality opinion) (citing *Freedman*, 380 U.S. at 58–60, 85 S.Ct. 734).[5]

*FW/PBS* thus makes clear "that otherwise valid content-neutral time, place, and manner restrictions that require govern-mental permission prior to engaging in protected speech must be analyzed as prior restraints and are unconstitutional if they do not limit the discretion of the decisionmaker and provide for the *Freedman* procedural safeguards." *11126 Baltimore Blvd., Inc. v. Prince George's County, Md.*, 58 F.3d 988, 995 (4th Cir.), *cert. denied*, 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 492 (1995) (citing *FW/PBS*, 493 U.S. at 227–28, 110 S.Ct. 596); *accord Franken Equities, L.L.C. v. City of Evanston*, 967 F.Supp. 1233, 1236 (D.Wyo.1997); *cf. Marty's Adult World of Enfield, Inc. v. Town of Enfield, Conn.*, 20 F.3d 512, 515 (2d Cir.1994) (holding that zoning ordinance requiring special use permit for all changes in use from retail to entertainment, *regardless of content* of the entertainment, did not constitute licensing scheme amounting to prior restraint, because it did not single out business based on content of speech and permitted business to operate elsewhere without obtaining permit). Here, the Ordinance does not merely limit the exercise of plaintiffs' First Amendment rights to certain places or times, but requires plaintiffs-because of the sexual or erotic nature of the performances conducted at plaintiffs' businesses-to obtain a license before they will be allowed to offer those performances to the public. I therefore conclude that the license requirements should be analyzed as a prior restraint according to the principles set forth in *FW/PBS*, 493 U.S. at 227–28, 110 S.Ct. 596.

■ In addition, "[l]icensing, though functioning as a prior restraint, is constitu-

---

5. Justice O'Connor, joined by Justices Stevens and Kennedy, stated in *FW/PBS* that a third factor set forth in *Freedman*-that "the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court," *id.* at 227, 110 S.Ct. 596was not required in the context of the licensing scheme at issue in *FW/PBS*. *Id.* at 228–30, 110 S.Ct. 596. In his concurring opinion, Justice Brennan, joined by Justices Marshall and Blackmun, opined that all three of the *Freedman* procedural safeguards were required. *Id.* at 238–39, 110 S.Ct. 596. All six of those justices, however, agreed that the first two safeguards were needed for the licensing scheme to be upheld.

tionally legitimate when it complies with the standard for time, place or manner requirements." *Schultz*, 228 F.3d at 851 (citing *Cox v. New Hampshire*, 312 U.S. 569, 575–76, 61 S.Ct. 762, 85 L.Ed. 1049 (1941)). Accordingly, such licensing regulations may be upheld only if they are (1) narrowly tailored to serve a significant government interest unrelated to the suppression of free expression, and (2) leave alternative channels for communication. *Id.; Charette*, 159 F.3d at 754.

**B. Constitutionality of the Ordinance– Regulation of Conduct**

■■■ Plaintiffs challenge those portions of the Ordinance that prohibit persons from engaging in certain types of activities within or on the premises of sexually oriented businesses. Plaintiffs assert that these regulations constitute impermissible restrictions on their First Amendment rights.

Section 98–21 provides that "[n]o person in or on the premises of a sexually oriented business shall engage in any specified sexual activities." As noted above, "specified sexual activities" is defined as including a number of acts ranging from "actual ... sexual intercourse" to "fondling ... one's own ... buttocks or female breasts, whether clothed or unclothed ...."

As explained earlier, non-obscene nude or semi-nude dancing is expressive activity that is protected by the First Amendment. *Charette*, 159 F.3d at 753. The state may regulate that activity, provided that it does so in a manner that comports with the four-part test set forth in *O'Brien*.

So long as it is not obscene, however, expressive conduct may not be regulated solely on the basis of its content. That holds true no matter how tasteless or offensive it might seem to some, or even most, segments of society. As the Second Circuit has stated, "while the entertain-

ment afforded by a nude ballet at Lincoln Center to those who can pay the price may differ vastly in content (as viewed by judges) or in quality (as viewed by critics), it may not differ in substance from the dance viewed by the person who, having worked overtime for the necessary wherewithal, wants some 'entertainment' with his beer or shot of rye." *Salem Inn v. Frank*, 501 F.2d 18, 21 n. 3 (2d Cir.1974) (quoted in *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 391 (4th Cir.1993)), *aff'd in part, rev'd on other grounds in part*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).

In the case at bar, I find that the Ordinance's restrictions on performers' activities are constitutionally infirm in a number of respects. These restrictions are clearly aimed at the expressive nature of the conduct at issue, and hence cannot be said to be "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673. In addition, there is no basis upon which to believe that the restrictions will in fact further the important or substantial governmental interest asserted here, *i.e.*, the curbing of adverse secondary effects, and even if they did, these restrictions fail to comply with *O'Brien*'s mandate that "the incidental restriction on alleged First Amendment freedoms [be] no greater than is essential to the furtherance of that interest." *Id.*

First, to the extent that the activities of the performers at sexually oriented businesses constitute expressive conduct, the message conveyed is presumably one of eroticism. *See Barnes*, 501 U.S. at 581, 111 S.Ct. 2456 ("where the dancer is nude or nearly so the feeling expressed, in the absence of some contrary clue, is eroticism, carrying an endorsement of erotic experience") (Souter, J., concurring); *Schultz*, 228 F.3d at 847 ("The dominant theme of nude dance is 'an emotional one;

it is one of eroticism and sensuality'") (quoting *Miller v. City of South Bend*, 904 F.2d 1081, 1086–87 (7th Cir.1990), *rev'd on other grounds sub. nom. Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991)). It is also clear that the Ordinance *expressly* targets the sexual or erotic aspects of the performers' activity, and hence burdens the expression of that activity's erotic message as well. For example, the Ordinance expressly prohibits anyone at a sexually oriented business from engaging in "erotic touching" of certain parts of the human body. It does not, therefore, simply ban or restrict certain conduct, irrespective of any message that the conduct may be intended to convey; instead, by its own terms the Ordinance is directed to activity that conveys eroticism or sexuality. *Cf. Erie*, 529 U.S. at 290, 120 S.Ct. 1382 (noting that ordinance, which the court found valid, "does not target nudity that contains an erotic message; rather, it bans all public nudity, regardless of whether that nudity is accompanied by expressive activity").

If the Ordinance's restrictions furthered an important or substantial governmental interest, and did so in a manner that imposed no greater a burden on First Amendment freedoms than necessary, it might nonetheless be upheld as constitutional. It fails to meet that standard, however.

The Ordinance contains a number of findings concerning the undesirable secondary effects associated with sexually oriented businesses, generally relating to "ancillary unlawful and unhealthy activities . . . ." Ordinance § 98–1(1). The findings indicate that these activities occur because employees of sexually oriented businesses engage in or are requested to engage in sexual behavior, because the "entertainment" provided at sexually oriented businesses encourages sexual activities, and

because of the failure of the owners and operators of sexually oriented businesses to regulate the activities that occur there.

For the ban on specified sexual activities to pass constitutional muster, however, there must be some demonstrable nexus between those activities and the evils sought to be addressed. As another district court from this circuit has stated, "if the government seeks to indirectly address these . . . evils by [restricting the activities of] dancers engaged in expressive First Amendment activity . . ., the Constitution requires that there be some connection between the restriction and the evil sought to be eradicated." *Nakatomi Investments, Inc. v. City of Schenectady*, 949 F.Supp. 988, 997 (N.D.N.Y.1997). When a municipality seeks to regulate protected activity in order to further some legitimate governmental interest, then, "the First Amendment requires, not that the restriction be merely *related* to the governmental interest asserted, but rather that each restriction imposed *furthers* an important or substantial governmental interest." *Id.* at 997 (citing *O'Brien*, 391 U.S. at 376–77, 88 S.Ct. 1673). *See also Erie*, 529 U.S. at 280, 120 S.Ct. 1382 ("*O'Brien* requires . . . that the regulation further the interest in combating such effects").

Here, there is simply no basis upon which one can reasonably conclude that the restrictions in question will in any way further the governmental interest asserted here, *i.e.*, combating the secondary effects that the Ordinance is ostensibly intended to address. The Ordinance suggests that the sexual nature of the entertainment offered at sexually oriented businesses encourages sexual activity, which in turn leads to crime and unhealthy conditions. It is unclear, however, how those secondary effects are going to be affected by enforcing particular restrictions on a performer's movements. Will prostitution or

the transmission of sexually transmitted diseases decrease, for example, simply because performers are not allowed to touch certain parts of their bodies? There is nothing in the record to suggest that such a result would follow.

It appears that the most direct and immediate impact of the Ordinance's limitations on dancers' activities would be to restrict their ability to convey an erotic message; the proscribed actions are among the most obvious and explicit ways in which a performer might choose to convey a message of eroticism. The problem, however, is that according to the Ordinance itself, that message is not the evil that is sought to be targeted.[6] Rather, the proffered justification for the Ordinance's restrictions is that the secondary effects of crime and the spread of disease will be reduced. What is completely lacking, however, is some explanation of how the means chosen will produce the desired ends.

In support of these restrictions, particularly the ban on "fondling and erotic touching," defendant relies upon the Supreme Court's decision in *Erie*, 529 U.S. 277, 120 S.Ct. 1382. There, the Court upheld a municipal ordinance making it an offense to knowingly or intentionally appear in public in a state of nudity. In particular,

defendant notes the Court's statement that "even if Erie's public nudity ban has some minimal effect on the erotic message by muting that portion of the expression that occurs when the last stitch is dropped, the dancers ... are free to perform wearing pasties and G-strings. Any effect on the overall expression is *de minimis*." *Id.* at 294, 120 S.Ct. 1382.

Contrary to what the City states in its brief, however, the ordinance at issue in *Erie* was not simply a "prohibition on nude *dancing*," Defendant's Memorandum of Law at 22 (emphasis added), but a ban on *all* public nudity. As the Supreme Court stated in its decision, "[b]y its terms, the ordinance regulates conduct alone. It does not target nudity that contains an erotic message; rather, it bans all public nudity, regardless of whether that nudity is accompanied by expressive activity." *Id.* at 290, 120 S.Ct. 1382.

In contrast, the Ordinance here is expressly directed at performances of an *erotic* nature. The types of conduct that constitute "specified sexual activity"-which is prohibited in all sexually oriented businesses-are, as expressly defined by the Ordinance, sexual or erotic in nature.

Faced with a similar ordinance, the Court of Appeals for the Seventh Circuit

---

**6.** Although the Ordinance largely focuses on the secondary effects associated with sexually oriented businesses, I note that the Ordinance does state at § 98–I(A) that its purpose is "to regulate sexually oriented businesses in order to promote the health, safety, *morals*, and general welfare of the citizens of the City." (Emphasis added.) While the City in this action does not appear to contend that the sexually oriented nature of the live entertainment at plaintiffs' businesses is itself an evil or public ill that the Ordinance is designed to combat, or that the Ordinance can be justified on the ground that it furthers the government's interest in promoting public morality, I find that the Ordinance's prohibition of "specified sexual activity" could not be up-

held on that basis in any event. *See Sable Communications*, 492 U.S. at 124–26, 109 S.Ct. 2829 (noting that "[s]exual expression which is indecent but not obscene is protected by the First Amendment"); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) ("[n]udity alone does not place otherwise protected material outside the mantle of the first amendment") (citation omitted); *Nakatomi*, 949 F.Supp. at 999–1000 (stating that city's position was essentially that nude dancing in bars and similar establishments was "morally repugnant as compared to the same conduct presented in the theatre or opera," and that "[t]his is precisely the kind of censorship ... against which the First Amendment aims to guard").

in *Schultz* stated that, unlike the general ban on public nudity in *Barnes,* the ordinance in *Schultz* went "several steps further. Section VIII(A) outlaws the performance of a strikingly wide array of sexually explicit dance movements, or what the Ordinance misdenominates as 'specified sexual activities,' including 'the fondling or erotic touching of human genitals, pubic region, buttocks, anus, or female breasts.'" 228 F.3d at 847.

The court went on to state that

[b]y restricting the particular movements and gestures of the erotic dancer, in addition to prohibiting full nudity, Section VIII(A) of the Ordinance unconstitutionally burdens protected expression. The dominant theme of nude dance is "an emotional one; it is one of eroticism and sensuality." *Miller,* 904 F.2d at 1086–87. Section VIII(A) deprives the performer of a repertoire of expressive elements with which to craft an erotic, sensual performance and thereby interferes substantially with the dancer's ability to communicate her erotic message. It interdicts the two key tools of expression in this context that imbue erotic dance with its sexual and erotic character-sexually explicit dance movements and nudity. Unlike a simple prohibition on full nudity, Section VIII(A) does much more than inhibit "that portion of the expression that occurs when the last stitch is dropped." *Erie,* 120 S.Ct. at 1393. Section VIII(A) constrains the precise movements that the dancer can express while performing. The dancer may use non-sexually explicit elements and semi-nudity to convey a certain degree of sensuality, but putting taste aside, more explicit and erotic content is commonly available on primetime television without being fairly regarded as adult entertainment. The Court has declared that the government cannot "ban all adult theaters-much less

all live entertainment or all nude dancing." *Schad,* 452 U.S. at 71, 101 S.Ct. 2176. We ourselves explained in *DiMa* [*Corp. v. Town of Hallie,* 185 F.3d 823 (7th Cir.1999), *cert. denied,* 529 U.S. 1067, 120 S.Ct. 1673, 146 L.Ed.2d 482 (2000)], "Because this speech is not obscene, government may not simply proscribe it." *DiMa,* 185 F.3d at 827. Cumberland cannot avoid this dictate by regulating nude dancing with such stringent restrictions that the dance no longer conveys eroticism nor resembles adult entertainment. The portion of Section VIII(A) that bars the "depiction of specified sexual activities" is unconstitutional because it prevents erotic dancers from practicing their protected form of expression.

*Id.* at 847–48.

I believe that the Seventh Circuit's reasoning is fully applicable to the case at bar. The Ordinance here does not simply require some minimal amount of clothing as did the ordinance in *Erie,* but directly restricts and regulates the manner in which the dancers perform. As such, it directly targets not just "conduct alone," *Erie,* 529 U.S. at 290, 120 S.Ct. 1382, but the expressive aspects of the performers' conduct, and it therefore imposes far more than a *de minimis* restriction on the performers' freedom of expression. Because there is no indication that the restrictions imposed by the Ordinance will tend to produce more than a *de minimis* reduction of the negative secondary effects associated with sexually oriented businesses, however, I find it unconstitutional.

Furthermore, as the court in *Schultz* pointed out, this ruling does not leave the City powerless to deal with the perceived ancillary problems associated with sexually oriented businesses. The City can certainly enforce existing criminal laws con-

cerning prostitution, drugs, gambling, etc. to combat those effects. *See Nakatomi,* 949 F.Supp. at 997 (noting that "better enforcement of existing laws against prostitution and drug use" would further government's interest in reducing those activities). In addition, zoning ordinances may lawfully be used to regulate sexually oriented businesses, provided that they meet the standards applicable to content-neutral time, place and manner regulations. *See Renton,* 475 U.S. at 47–49, 106 S.Ct. 925; *Charette,* 159 F.3d at 754. Also, to the extent that the Ordinance seeks to prohibit *obscene* activities, the City may seek to do so using New York's existing obscenity statutes. *See* N.Y. Penal L. art. 235. Indecent, tasteless nude dancing is protected; *obscene* conduct is not and is proscribed in New York and in virtually all states by criminal statutes.

For that matter, my decision today should not be interpreted as meaning that *none* of the specified sexual activities listed in the Ordinance could constitutionally be proscribed through a well-crafted ordinance. As the Supreme Court has pointed out, "[i]t is possible to find some kernel of expression in almost every activity a person undertakes[,] . . . but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin,* 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989). Thus, just as "[b]eing 'in a state of nudity' is not an inherently expressive condition," and hence not protected by the First Amendment, *Erie,* 529 U.S. at 289, 120 S.Ct. 1382, not every sexual act constitutes expressive activity, and it is possible that some such acts may, through a well-crafted ordinance, legitimately be prohibited from being engaged in in public. *See, e.g., Hang On,* 65 F.3d at 1253–54 ("intentional contact between a nude dancer and a bar patron is conduct beyond the expressive scope of the dancing itself. The conduct at

that point has overwhelmed any expressive strains it may contain"); *Threesome Entertainment v. Strittmather,* 4 F.Supp.2d 710, 721 (N.D.Ohio 1998) (First Amendment "does not protect any such kernel [of expression] contained in the activities of sexual intercourse or fondling of genitals. This aspect of the Ordinance 'is not a means to some greater end, but an end in itself'-prohibiting overtly sexual acts in public places") (citing *Barnes,* 501 U.S. at 572, 111 S.Ct. 2456).

In its present form, however, the Ordinance covers not just non-expressive or obscene conduct, but conduct that clearly could be both expressive and non-obscene, and it directly restricts the ability of those who engage in such conduct to convey its intended (and protected) message. The Ordinance therefore fails to meet the requirement that any incidental restriction on First Amendment freedoms be "no greater than is essential" to further the government's legitimate interests sought to be advanced by the Ordinance. *O'Brien,* 391 U.S. at 377, 88 S.Ct. 1673. Given the long line of cases establishing that non-obscene nude dancing is protected by the First Amendment, I am constrained to find § 98–21(A)'s prohibition of "any specified sexual activities" in or on the premises of a sexually oriented business unconstitutional.

■ Other parts of § 98–21 are less troubling, and indeed some are not challenged at all by plaintiffs. The provisions concerning physical separation of performers and customers, and the stage and barrier requirements (§§ 98–21(B), (C)), are reasonable time, place and manner restrictions. "Several courts . . . have upheld ordinances with buffer zone requirements in the face of First Amendment challenges." *Threesome Entertainment,* 4 F.Supp.2d at 723 (collecting cases); *DFW*

*Vending, Inc. v. Jefferson County, Tex.,* 991 F.Supp. 578, 595 (E.D.Tex.1998) (same; also collecting cases). *See, e.g., Colacurcio,* 163 F.3d at 552–57; *BSA,* 804 F.2d at 1111 (six-foot/eighteen-inch distance requirement furthered significant state interest in curtailing public sexual contact and sexual criminal offenses by keeping nude entertainers just out of reach of the nearest patron, and district court therefore properly found that requirement constituted valid place or manner regulation). In fact, there is no suggestion in plaintiffs' papers that they are challenging these provisions, and at oral argument plaintiffs' counsel confirmed that he was not challenging the setback rule.

Likewise, I find that the provisions prohibiting performers from soliciting gratuities (§ 98–21(G)), and customers from tipping while the performer is performing nude or semi-nude (§ 98–21(H)), are reasonable restrictions that further the City's interest in preventing prostitution. *J.L. Spoons,* 49 F.Supp.2d at 1046.

The remaining provisions in § 98–21 do not appear to be challenged by plaintiffs, and hence the issue of their validity is not before the court at this time. To the extent that plaintiffs may be challenging them, however, all of these provisions (*e.g.,* the requirement that nude or semi-nude performers remain in areas where they are not visible from off the premises (§ 98–21(E)), the prohibition against anyone under the age of eighteen being on the premises of a sexually oriented business (§ 98–21(I)), and the provision requiring compliance with state liquor laws (§ 98–21(J))), appear to be reasonable time, place and manner restrictions, and are not unconstitutional.[7]

## C. Constitutionality of the Ordinance– Licensing Requirements and Disabling Provisions

Plaintiffs do not appear to contend that the Ordinance's licensing requirement in and of itself is unconstitutional. In other words, plaintiffs concede that the City may require the owners and employees of a sexually oriented business to obtain a license from the City before operating or working at that business. Established case law makes clear that municipalities may indeed impose such requirements, even when the exercise of First Amendment freedoms is implicated, provided that the licensing ordinance meets certain constitutionally required criteria. *See Charette,* 159 F.3d at 754.

Plaintiffs do, however, challenge certain particular aspects of the licensing provisions. Plaintiffs object to the requirement that various types of information be provided in the license application, and that such information be provided under oath. Plaintiffs also contend that some of the factors that constitute grounds for denial or revocation of a license are not reasonably related to any legitimate governmental interests sought to be furthered by the Ordinance, and they claim that the Ordinance gives the Chief too much discretion to make determinations regarding the truthfulness and sufficiency of the completed application. An analysis of these issues requires that the challenged provisions be examined *seriatim.*

### 1. Disabling Provisions

Plaintiffs challenge some of the disabling provisions of the Ordinance, *i.e.* the provisions setting forth factors that can result in denial of a license. As stated, the con-

---

7. I also note that some portions of the Ordinance (such as § 98–23, which prohibits "body rub parlors" from operating within the City) have no applicability to plaintiffs at all, and hence the issue of their constitutionality is also not before the court in these actions.

stitutionality of these provisions must be analyzed according to the standards set forth by the Supreme Court in *FW/PBS* and *Renton.*

### Failure to Provide Necessary or Truthful Information

Sections 98–9(B)(1) and 98–10(A)(1)[8] state that a license may be denied if "[a]n applicant has failed to provide information reasonably necessary for issuance of the license or has falsely answered a question or request for information on the application form." This provision is constitutional on its face; however, it must be applied consistently with the court's rulings on the constitutionality of the information in question. For example, a license cannot constitutionally be denied because the applicant has failed to provide information about prior gambling or drug convictions, because, as explained below, that information is not reasonably related to the governmental interests that the Ordinance is intended to further. Failing to state, or falsely reporting, one's age, on the other hand, can be a legitimate ground for denial, since the City may legitimately require that the applicant be at least eighteen years of age.

### Conviction of "Specified Criminal Activity"

 Under §§ 98–9(B)(3) and 98–10(A)(3), a license may be denied if the "applicant has been convicted of a specified criminal activity." "Specified criminal activity" is defined in § 98–2 as: "prostitution offenses; obscenity and related offenses; sexual performance by a child; possession or distribution of child pornography; offenses against public sensibilities; enterprise corruption; money laundering; sex offenses; unlawfully dealing with a

child; gambling offenses; controlled substances offenses or offenses involving marijuana, other than unlawful possession of marijuana .... " Depending on the severity of the offense, the conviction must also have occurred within a certain time period prior to the date of the application.

The Ordinance contains, among its findings, that "[t]he fact that an applicant for an adult license has been convicted of a sexually related crime leads to the rational assumption that the applicant may engage in that conduct in sexually oriented businesses in which sexual activities often occur." Ordinance § 98–I(15). The Ordinance adds that "[t]he barring of such individuals from association with adult uses for a period of years serves as a deterrent to and prevents conduct which leads to unwanted sexual activities." Ordinance § 98–I(16). The findings make no mention of what purpose is served by barring individuals who have been convicted of non-sexually related crimes such as gambling or money laundering, however.

As to such non-sex crimes, I find that the City has failed to demonstrate that this disabling provision bears any reasonable relation to furthering the governmental interest at stake here, *i.e.* curbing the unwanted secondary effects associated with sexually oriented businesses. "Persons with prior criminal records are not First Amendment outcasts." *Fernandes v. Limmer,* 663 F.2d 619, 630 (5th Cir.1981), *cert. dismissed,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982). Although courts have held that a municipality may deny licensure "when an individual has been convicted of specified crimes that relate to the 'crime-control intent' of the ordinance," *i.e.* crimes that directly relate to the sorts of crimes that the ordinance is intended to

8. Where two sections are cited for the same language or requirements, these refer to parallel provisions for sexually oriented business licenses and for manager or employee licenses, unless otherwise stated.

reduce, *Tee & Bee, Inc. v. City of West Allis*, 936 F.Supp. 1479, 1489 (E.D.Wis. 1996), courts have struck down such disabling provisions where convictions for the crimes in question have no demonstrable relation to the purpose of the ordinance.

For example, in *Schultz*, the Seventh Circuit struck down a provision that disqualified any applicant who had been convicted of a "specified criminal activity," the definition of which was similar to that in the Ordinance here.[9] In holding that this provision was unconstitutional, the Seventh Circuit stated that "[t]he First Amendment ... does not allow licensing provisions based on criminal history that 'totally prohibit certain classes of persons' from First Amendment expression." 228 F.3d at 852 (quoting *Genusa*, 619 F.2d at 1218). At least absent a showing "that ownership or performance by those convicted of specified criminal activity or misconduct is more likely to lead to secondary effects than ownership or performance by anyone else," the court stated, "the government may not categorically disenfranchise a class from protected expression in this licensing context ... because it thereby fails to provide the alternative channels for communication required by *Renton* and *Young* for those speakers." *Id.* at 853. The court therefore held that the "required disclosures of the applicant's criminal and past licensing histories are unnecessary because, absent any disqualification ground on those bases, such disclosures are unjustified by a government interest here." *Id. See also Movie & Video World, Inc. v. Board of County Com'rs of Palm*

*Beach County, Florida*, 723 F.Supp. 695, 703 (S.D.Fla.1989) (finding "no logical relation between the applicant's, partner's, or shareholder's prior felony convictions and the stated purposes of the ordinance"); *Ellwest Stereo Theater*, 718 F.Supp. at 1568 (striking down criminal disclosure requirement on ground that prior felony conviction would not support inference that applicant would be more likely to violate ordinance). *Suburban Video, Inc. v. City of Delafield*, 694 F.Supp. 585, 592, 595 (E.D.Wis.1988) (striking down requirement that applicant disclose "[a]ll criminal statutes, whether federal or state, or city ordinance violation convictions, forfeiture of bond and pleadings of nolo contendere on all charges, except minor traffic violations"); *Natco Theatres*, 463 F.Supp. at 1129–30 (striking down provision under which license could be denied if the applicant had been convicted "of any of a host of criminal offenses, both related and unrelated to the operation of a movie theatre"; "The City may not, as it has tried to do, utilize its licensing power to deprive a party of the right to exercise a constitutionally protected right solely because of past misconduct").

In *FW/PBS, Inc. v. City of Dallas*, 837 F.2d 1298, 1305 (5th Cir.1988), *aff'd in part, vacated on other grounds in part*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), the Fifth Circuit affirmed a district court decision that partially struck down a provision that denied licenses to persons convicted of certain crimes. The district court had scrutinized the list of crimes that would make an applicant ineli-

---

**9.** "Specified criminal activity" was defined in the ordinance in *Schultz* as:

 prostitution or promotion of prostitution; dissemination of obscenity; sale, distribution or display of harmful material to a minor; sexual performance by a child; possession or distribution of child pornography; public lewdness; indecent expo-

sure; indecency with a child; engaging in organized criminal activity; sexual assault; molestation of a child; gambling; or distribution of a controlled substance; or any similar offenses to those described above under the criminal or penal code of other states or countries.

228 F.3d at 853 n. 6.

gible for a license and invalidated those that it found to have no relationship to the purpose of the ordinance, including kidnapping, robbery, bribery, controlled substances violations, and "organized criminal activities." *Id.* at 1305 n. 22. The district court left intact the provision for denial based on convictions of certain other crimes, including: a variety of prostitution offenses; obscenity; sale, distribution, or display of harmful material to a minor; sexual performance by a child; possession of child pornography; public lewdness; indecent exposure; indecency with a child; sexual assault; aggravated sexual assault; and incest, solicitation of a child, or harboring a runaway child. *Id.* at 1304 n. 19. Stating that a municipality must show a "substantial relationship ... between the conviction and the evil sought to be prevented," the Court of Appeals said that "the Ordinance now is well tailored sufficiently to achieve its ends. Ineligibility results only from offenses that are related to the kinds of criminal activity associated with sexually oriented businesses.... The relationship between the offense and the evil to be regulated is direct and substantial." *Id.* at 1305 (footnotes omitted).

Based on the reasoning of these cases, I also find that several of the crimes that constitute "specified criminal activity" have no reasonable relationship to the City's interest in combating the secondary effects associated with sexually oriented businesses. In particular, I see no connection between that interest and whether an applicant has been convicted of enterprise corruption,[10] money laundering, gambling offenses, or drug offenses. Convictions for the remaining crimes-prostitution offenses,

obscenity and related offenses, sexual performance by a child, possession or distribution of child pornography, offenses against public sensibilities,[11] sex offenses, and unlawfully dealing with a child-are sufficiently related to the kinds of criminal activity associated with sexually oriented businesses to provide a legitimate basis for denying a license.

**Prior Revocation or Denial of License**

■ Sections 98–9(B)(6) and 98–10(A)(5) provide for denial if the "applicant has had a sexually oriented business license, a sexually oriented business manager license or a sexually oriented business employee license revoked by the City within two (2) years, or denied by the City within one (1) year, of the date of the current application."

Some courts have upheld mandatory *disclosure* of information about prior license denials or revocations, on the theory that such information is relevant to the municipality's legitimate and substantial interest in knowing whether an applicant has a history of violations of the ordinance and related regulations. *See, e.g., TK's Video, Inc. v. Denton County, Texas,* 24 F.3d 705, 710 (5th Cir.1994) (disclosure of prior violations serves to "monitor persons with a history of regulatory violations ... who would manage or work in" adult businesses); *accord Tee & Bee,* 936 F.Supp. at 1487–88; *Ellwest Stereo Theater,* 718 F.Supp. at 1567.

In addition, the court in *Tee & Bee* upheld a disability provision based on prior ordinance violations, stating, "An individual's past actions are very often the best

---

10. The New York "enterprise corruption" statute, Penal L. § 460 .20, is an analog to the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

11. "Offenses against public sensibilities" in New York include public lewdness, exposure of a person, promoting the exposure of a person, offensive exhibition, and public display of offensive sexual material. *See* Penal L. art. 245.

indicator of that person's future actions. Denying licensure to individuals who have recently violated an adult-oriented business ordinance is a reasonable means by which to ensure that those licensed to operate adult businesses will respect and abide by the provisions regulating the business." 936 F.Supp. at 1489. *See also Movie & Video World,* 723 F.Supp. at 704 (provision that required disclosure of status of prior licenses under ordinance, which was intended to enforce section of the ordinance providing for denial of license application if applicant had previously had his adult entertainment license suspended or revoked, was reasonably related to the stated purpose and enforcement of the ordinance, and was therefore valid).

The court in *Schultz* did invalidate a similar disability provision when it struck down the criminal disability provision in that case, along with a third provision that rendered applicants ineligible if they were delinquent in their city taxes. All of these provisions, the court stated, disentitled an entire class of persons from protected expression. 228 F.3d at 853.

The *Schultz* court did not analyze these different provisions separately, however, or discuss whether different considerations might apply to an applicant who has been convicted of a particular crime, an applicant who has had a prior license revoked or denied, and an applicant who is delinquent in his tax obligations. In addition, although the court likened the disability requirements in *Schultz* to similar requirements that the court had struck down in *Genusa,* the court failed to note that the court in *Genusa* had invalidated the required disclosure of past ordinance violations because they were unrelated to the city's stated goal of preventing adult businesses from *congregating* in one location. *Genusa,* 619 F.2d at 1218–19. In upholding a provision requiring disclosure of past

violations, the Fifth Circuit in *TK's Video* distinguished *Genusa* on that ground, stating that while "[d]isclosure of owner and employee personal history might not be tailored to *locating* adult businesses, ... it does monitor persons with a history of regulatory violations or sexual misconduct who would manage or work in them." 24 F.3d at 710 (emphasis added).

Upon consideration of this matter, I conclude that while the City does have a substantial interest in ensuring that those who violate the Ordinance, or otherwise engage in conduct which justifies revocation of their licenses, are prevented from obtaining a new license for a period of time, no such interest is evident with respect to persons whose license applications were merely denied.

Clearly, as the court in *Tee & Bee* observed, the City has an interest in ensuring that those to whom licenses are issued will abide by the requirements of the Ordinance, and it is not unreasonable to assume that someone who has recently violated the Ordinance may be more likely to violate it again than someone with a clean record. In addition, a disability provision based on past violations acts as a deterrent against future violations. I also find that the provision for denial based on a revocation within the previous two years is reasonable. *See Tee & Bee,* 936 F.Supp. at 1488–89 (upholding disabling provision based on revocation within previous five years).

I see no similar justification with respect to prior *denials,* however. Unlike a license revocation, which presumably was based on an actual violation of the Ordinance, *see* Ordinance § 98–16 (setting forth grounds for revocation), a denial does not necessarily indicate anything other than a deficiency in the particular application that was denied.

Such a deficiency may well be capable of correction in a subsequent application. For example, the prior application may have been denied because: the applicant failed to pay the license fee; the applicant left a question blank on the application form; or the applicant was under the age of eighteen at the time of the application. None of those grounds for denial is necessarily indicative of misconduct or bad faith, nor would they tend to show that the applicant would be likely to violate the Ordinance if granted a license based upon a subsequent, sufficient application. Moreover, even if the reason for denial did relate to some culpable conduct, such as knowingly submitting false information, there are other less restrictive means (such as prosecution for perjury) for addressing such problems. As they are now written, therefore, I find §§ 98–9(B)(6) and 98–10(A)(5) to be unconstitutional, inasmuch as they permit denial of a license application based solely on the fact that a prior application was denied.

Sections 98–9(D) and 98–10(C) state that "[w]hen the Chief of Police denies a license, the applicant shall not be issued a license for one (1) year from the date of denial." Section 98–10(C), which applies only to sexually oriented business licenses, adds that "[t]his provision shall not apply if the reason for the denial relates to the business premises or location and all identified problems have been corrected."

These provisions suffer from the same defects as §§ 98–9(B)(6) and 98–10(A)(5). The mere fact that a person's application has been denied cannot justify precluding that person from submitting another application for a full year; each application should be considered on its own merits. In that regard, there is no logical reason to distinguish between denials related to the premises when all identified problems have been corrected, and denials related to other types of problems or defects (such as failure to pay the license fee) that have since been corrected. Furthermore, assuming that the City has some interest in preventing persons from filing repeated faulty applications, the license fee provides a suitable deterrent in that regard.

### Other Disabling Provisions

Sections 98–9(B)(2) and 98–10(A)(2) provide for denial of a license if the applicant is under the age of eighteen. Plaintiffs do not appear to challenge this provision, and I find that it is reasonably related to the City's legitimate interests in ensuring that adult-oriented businesses are owned and run by adults, and that minors are not exposed to the sexually oriented activities that occur there. See Threesome Entertainment, 4 F.Supp.2d at 726 (recognizing "legitimate governmental interest of preventing minors from entering an adult cabaret").

The provision in §§ 98–9(B)(4) and 98–10(A)(4) that a license may be denied if it is to be used for a business, or employment in a business, that is "prohibited by local or state law, statute, rule or regulation, or prohibited by a particular provision of this chapter," insofar as it simply requires compliance with all applicable laws and regulations, "is redundant and constitutionally inoffensive." Schultz, 228 F.3d at 851.

Section 98–10(A)(6) provides that a sexually oriented business license will be denied if "[t]he premises to be used for the sexually oriented business is in violation of applicable fire, zoning, building, property conservation or health and safety laws and ordinances." Plaintiffs do not appear to object to this requirement, which is certainly reasonable and in furtherance of the City's substantial interests in ensuring that the subject premises do not pose a public hazard, and in combating the sec-

ondary effect of depressed property values in areas near sexually oriented businesses.

Plaintiffs also do not object to, and I find no infirmity in, §§ 98–9(B)(5) and 98–10(A)(7), which provide that the license will be denied if the license fee has not been paid.

The final disabling provision, § 98–10(A)(8), provides for denial of a sexually oriented business license if "[a]n applicant or the proposed establishment is in violation of or is not in compliance with any of the provisions of this chapter." The constitutionality of this provision depends upon the underlying provision or provisions with which the applicant or establishment is not in compliance. On its face, then, this provision is constitutional.

### Standards for Issuance or Denial

■ Plaintiffs also contend that the Ordinance does not provide clear standards for issuance or denial of a license, and that it gives the Chief too much discretion to decide whether to grant or deny an application. I am not persuaded by these allegations.

The Second Circuit has stated that "[w]hen a municipality has adopted a regulatory scheme that requires a business to obtain a permit to operate regardless of its location, that scheme must set objective standards governing the grant or denial of license applications, in order to ensure that the officials not have the 'power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.' " *Charette*, 159 F.3d at 754 (quoting *City of Lakewood*, 486 U.S. at 759, 108 S.Ct. 2138). *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) ("a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional").

In addition, "a scheme that places 'unbridled discretion' " in the issuing authority will be struck down as unconstitutional censorship. *FW/PBS*, 493 U.S. at 225–26, 110 S.Ct. 596.

That is not the situation here. The Ordinance in this case is distinguishable from others that have been struck down on these grounds. For example, in *Shuttlesworth*, 394 U.S. at 149–50, 89 S.Ct. 935, the Supreme Court held that an ordinance that allowed an official to deny a parade permit if its issuance would threaten "the public welfare, peace, safety, health, decency, good order, morals, or convenience" of the community vested "virtually unbridled and absolute power" in the licensing authority. *See also T & A's*, 109 F.Supp.2d at 172–73 (striking down code provision requiring members of planning board to deny permits on the basis of their views as to health, safety, comfort and convenience and "any other additional standards, conditions and requirements, including a limitation on hours of operation, as it may deem necessary or appropriate to promote the public health, safety and welfare and to otherwise implement the intent of this chapter," on grounds that provisions were "vague and essentially subjective," "fail adequately to advise applicants of whether, and under what circumstances, constitutionally protected activities can be pursued," and "facilitate restrictions on activities that may, in fact, not be prohibited by the ordinance. In sum, they offer no meaningful guidance to the Planning Board as to how to conduct its affairs to facilitate appropriate public, and meaningful judicial, scrutiny in a constitutionally sensitive area"); *801 Conklin Street Ltd. v. Town of Babylon*, 38 F.Supp.2d 228, 233, 244–45 (E.D.N.Y.1999) (striking down provision stating that before issuance of special use permit, town board had to make fourteen findings of fact, including findings

that "Such use is reasonable, necessary and will be in harmony with and promote the general interests and welfare of the surrounding community," and that "The site is particularly suitable for the location of such use in the community"; these "open-ended nebulous requirements ... clearly bestow unlimited discretion to the Town Board, leaving open the possibility of content-based discrimination," and "[t]his unconstitutional discretion is heightened by the additional provision allowing the Town Board to 'impose any additional requirement to assure that the standards ... will be met' "); *Diamond v. City of Taft,* 29 F.Supp.2d 633, 649–50 (E.D.Cal.1998) (stating that section of city zoning ordinance providing that sexually oriented businesses could be granted conditional use permits only where deemed "essential or desirable to the public convenience or welfare," "clearly vests the Taft City Council with unfettered discretion and raises 'the spectre of selective enforcement on the basis of the content of speech' ") (quoting *Gaudiya Vaishnava Soc'y v. City and County of San Francisco,* 952 F.2d 1059, 1066 (9th Cir.1990), *cert. denied,* 504 U.S. 914, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992)), *aff'd,* 215 F.3d 1052 (9th Cir.2000), *cert. denied,* 531 U.S. 1072, 121 S.Ct. 763, 148 L.Ed.2d 665 (2001); *MD II Entertainment, Inc. v. City of Dallas, Texas,* No. 3–92–CV–1090, 1993 WL 227774 *9

(N.D.Tex. Apr.15, 1993) (ordinance allowing chief of police to deny a license if "[a]n applicant or an applicant's spouse is not of good moral character and does not have a good reputation for being peaceable and law-abiding in the community where the applicant or the applicant's spouse resides or does business," vested city with impermissible amounts of discretion and lacked narrow, objective, and definite standards necessary to guide the licensing authority), *aff'd,* 28 F.3d 492 (5th Cir.1994).

In contrast, the Ordinance in the cases at bar provides that after a completed license application is filed and the thirty-day investigation is completed, "the Chief of Police *shall* issue a license, unless it is determined" that one of the disabling conditions exists. Ordinance §§ 98–9(B), 98–10(A) (emphasis added). Although the court has already held some of those conditions to be unconstitutional for other reasons, none of them gives the Chief much discretion, much less the "unbridled discretion" condemned in *FW/PBS,* 493 U.S. at 225, 110 S.Ct. 596. All of them relate to straightforward factual determinations, such as the applicant's age, criminal record, payment of the license fee, etc. Plaintiffs' contention that these provisions vest impermissibly broad discretion in the licensing authority is simply without foundation [12].

---

**12.** Plaintiffs do not appear to allege that the licensing scheme here suffers from the other "evil" that the Supreme Court stated "will not be tolerated," *i.e.* the absence of the *Freedman* procedural safeguards. *FW/PBS,* 493 U.S. at 225–26, 110 S.Ct. 596. Even if they did raise such a challenge, however, I would reject it as meritless. Section 98–19 of the Ordinance provides for prompt access to the state courts, *see Beal v. Stern,* 184 F.3d 117, 129 (2d Cir. 1999) ("prompt access to judicial review in state courts would satisfy *Freedman* ") (emphasis added); *see also MacDonald v. Safir,* 206 F.3d 183 (2d Cir.2000) (noting that *Beal* held that "prompt access to judicial review in

state courts would satisfy *Freedman,*" but concluding that the record was insufficient to determine whether available state court proceedings satisfied that requirement), and also provides that a denial of a license renewal, or a suspension or revocation of a license, "shall be stayed ... throughout the pendency of the proceeding in the trial court." Thus, "regardless of how long this process takes, there is no risk of the suppression of protected activity." *4805 Convoy, Inc. v. City of San Diego,* 183 F.3d 1108, 1115 (9th Cir.1999). *See TK's Video,* 24 F.3d at 708 ("Because TK's was in business when the Order was adopted, its free speech activity cannot be suppressed pending

## 2. License Application Requirements

 Section 98–5(B) of the Ordinance provides in part that "[a]ll applicants must be qualified according to the provisions of this chapter." Section 98–5(C) also provides that "[i]f a person who wishes to operate a sexually oriented business is other than an individual, each individual who has a twenty percent (20%) or greater interest in the business must sign the application for a license as applicant. Each applicant must be qualified according to the provisions of this chapter and each applicant shall be considered a licensee if a license is granted."

In addition, § 98–5(D)(1)(c) provides in part that if the applicant is a corporation, the corporation must state its complete name, the names of all corporate officers, directors and principal stockholders, and certain other information related to the corporation. Plaintiffs contend that to the extent that this information relates to persons other than those responsible for the actual day-to-day operations of the establishment, these requirements are impermissible.

In response, the City asserts that plaintiffs somehow lack standing to assert this claim because they "suffer no harm from disclosing this information." Defendant's Memorandum of Law at 19. I disagree. For one thing, in each of the three cases before me, one of the plaintiffs is a corporation. That alone has been held to confer standing to challenge a corporate-disclosure requirement. *See Lady J. Lingerie*, 176 F.3d at 1366 (11th Cir.1999). Furthermore, as explained above, compelled disclosure of personal information that serves no legitimate purpose can itself constitute "harm" under the First Amendment. *See Buckley*, 424 U.S. at 64, 96 S.Ct. 612.

A number of other courts have struck down similar disclosure requirements for shareholders and part owners on the ground that there is no legitimate governmental interest in obtaining the names and personal history of shareholders or other persons who have no responsibility for the actual operation of a sexually oriented business. *See, e.g., Lady J. Lingerie*, 176 F.3d at 1366 ("we do not see a 'relevant correlation' or a 'substantial relation' between the names of principal stockholders and the harmful secondary effects of adult entertainment establishments. The City's best argument is that principal stockholders tend to have a discernable influence on management, and that the City needs to keep an eye on who is running adult businesses in town. But stockholders, *qua* stockholders, do not run corporations; officers and directors do. The City can enforce its rules through them"); *East Brooks Books, Inc. v. City of Memphis*, 48 F.3d 220, 226 (6th Cir.) ("We agree that the City has a legitimate interest in identifying those who are legally accountable for the operation of a sexually oriented business, and perhaps those who have a controlling or significant share in such a business. The requirement that every person with any ownership interest, regardless of how small, sign the application, however, is impermissibly broad"), *cert. denied*, 516 U.S. 909, 116 S.Ct. 277, 133 L.Ed.2d 198 (1995); *Acorn Investments, Inc. v. City of Seattle*, 887 F.2d 219, 225–26 (9th Cir.1989)

review of its license application by the County," since pursuant to the order, filing an appeal stayed a decision suspending or revoking a license until final decision by state district court); *see also City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 121 S.Ct. 743, 748, 148 L.Ed.2d 757 (2001) (where adult business is already licensed to do business and seeks to fend off a stop order, "[s]uch an establishment's typical concern ... is not the speed of court proceedings, but the availability of a stay of adverse action during the pendency of judicial review, however long that review takes").

("Because officers and directors, not shareholders, are legally responsible for the management of a corporation's business," there was "no logical connection between the City's legitimate interest in compliance with the . . . ordinance and the rule requiring disclosure of the names of shareholders"); *Genusa*, 619 F.2d at 1217 ("There would seem to be no purpose other than harassment in requiring the individual officers, directors, and stockholders to file separate statements or applications under oath. Requiring them to do so is an unjustified prior restraint and an invasion of privacy. Accordingly, the disclosure requirements as to officers, directors, and stockholders of corporate applicants are invalid") (footnote omitted); *Movie & Video World*, 723 F.Supp. at 703 ("There is no governmental interest in determining the identity and personal history of limited partners and stockholders who are not involved in the adult establishment's daily business"); *Ellwest Stereo Theater*, 718 F.Supp. at 1566, 1570 ("there is no government interest in determining the identity and personal history of limited partners and stockholders who ordinarily are not involved in the day-to-day business of the adult-oriented establishments"); *Suburban Video*, 694 F.Supp. at 592 (striking down requirement that all partners, officers, directors, and five-percent shareholders file separate applications under oath); *Natco Theatres*, 463 F.Supp. at 1131–32 (striking down disclosure requirements imposed on corporate applicant, licensee, its officers, principals, directors and stockholders owning more than ten percent of the outstanding stock of the corporation); *City of Colorado Springs v. 2354 Inc.*, 896 P.2d 272, 290 (Colo.1995) ("Because stockholders of a corporation are not in a position to carry out corporate policies or to respond promptly to notification of an Ordinance violation, the requirement that they sign an application is not justifiable") (en banc).

*But see Tee & Bee*, 936 F.Supp. at 1488 (upholding shareholder licensing and disclosure requirements, since provision that requirements only applied to shareholders holding more than ten percent of corporation's stock ensured that a shareholder holding *de minimis* interest would not be subject to regulation).

I find the reasoning of these decisions persuasive. Clearly the City has a substantial interest in knowing who is actually running or otherwise responsible for the operation of sexually oriented businesses within Rochester. Requiring disclosure of the identities of all shareholders and persons with a twenty percent or greater interest in the business, however, and requiring all such persons to sign the license application under oath and to qualify under the Ordinance is not reasonably related to that interest. In fact, the City implicitly recognizes that fact, since the Ordinance states that "[t]he disclosure of certain information by those persons *ultimately responsible for the day-to-day operation and maintenance* of the sexually oriented business, where such information is substantially related to the significant governmental interest in the operation of such uses, will aid in assuring that the sexually oriented business is operated appropriately." Ordinance § 98–1(13) (emphasis added).

I do, however, believe that the City can legitimately impose these disclosure and qualification requirements on corporate officers and directors, since even if they delegate the day-to-day management duties to their employees, they are ultimately responsible for ensuring compliance with the Ordinance. *See Ellwest Stereo Theater*, 718 F.Supp. at 1570 (upholding requirement that a corporate applicant provide the names and addresses of the officers and directors of the corporation, since officers and directors of a cor-

poration are ultimately responsible for the day-to-day operation of the business and therefore are responsible for insuring that the business is operated in accordance with the ordinance).

 Aside from the obligations placed upon shareholders and persons with a twenty percent or greater interest in the business, plaintiffs also challenge the requirements that certain types of information be provided by the applicant. Many of these relate to the eligibility requirements and disabling provisions contained in §§ 98–9 and 98–10. With respect to those items, the legitimacy of requiring that they be provided on the application depends upon whether they may legitimately be used to deny a license. Accordingly, I uphold the requirement that the applicant submit proof of his age (§§ 98–5(D)(1)(a), 98–6(C)(8)), which I have found is related to the City's substantial interests.

Section 98–6(C)(2), which applies to manager or employee license applications, requires the applicant to state his age, and date and place of birth. While requiring both the applicant's age and date of birth is arguably redundant, this requirement is not burdensome, and serves a legitimate purpose. *See Schultz*, 228 F.3d at 852 ("requiring proof of employee age legitimately relates to the government's interest in preventing underage performers from engaging in adult entertainment").

I see no need for requiring the applicant's *place* of birth, however. That has no apparent relevance to any substantial governmental interest at stake here, and I therefore find § 98–6(C)(2) to be unconstitutional insofar as it requires the applicant to state his place of birth.

 As for § 98–5(D)(1)(c)'s corporate disclosure requirements,[13] I find that the City may require the applicant to provide the corporation's name and date of incorporation, evidence that the corporation is in good standing under the laws of its state of incorporation, the names and capacity of all officers and directors, and the name of the registered corporate agent and the address of the registered office for service of process. These items are reasonably related to the City's interests in guarding against businesses being run in Rochester by phony corporations and in ensuring that the City will be able to contact and communicate responsible persons when necessary. I find unconstitutional, however, the requirement that the applicant disclose the names of all principal shareholders, for the reasons stated above.

Plaintiffs do not appear to challenge § 98–5(D)(2), which requires disclosure of the sexually oriented business's fictitious name, if any, and copies of the registration documents for that name. This provision is reasonably related to the City's interest in making sure that it can identify the business and to avoid confusion with other businesses, and I find it to be constitutional.

 With respect to §§ 98–5(D)(3) and 98–6(D)(4), requiring disclosure of whether the applicant has been convicted of a specified criminal activity, I find this provision to be unconstitutional insofar as it requires disclosure of convictions for enterprise corruption, money laundering, gambling offenses, or drug offenses. To the extent that this provision requires disclosure of the other offenses constituting "specified criminal activity" in § 98–2, I find it to be constitutional.

---

13. With respect to § 98–5(D)(1)(b), which requires certain partnership-related information, I find that plaintiffs lack standing to challenge that section, since all of the sexually oriented businesses in these cases are corporations, not partnerships.

Sections 98–5(D)(4) and 98–6(D)(2) require disclosure of whether the applicant has had a previous license under Chapter 98 or "other similar sexually oriented business chapters from another city or county" denied, suspended or revoked, and certain factual details relating to the denial, suspension or revocation. This provision also requires the applicant to disclose whether he has been a partner in a partnership, or an officer, director or principal stockholder of a corporation licensed under Chapter 98 whose license has previously been denied, suspended or revoked.

Although I have found that a prior revocation, but not a prior denial, may provide a legitimate basis for denying a license application, I believe that the City may impose somewhat broader *disclosure* requirements in this regard. The City has a legitimate and substantial interest in knowing an applicant's history with respect to licenses issued under Chapter 98. Also, even if a prior denial may not furnish a legitimate basis for denying a subsequent application, information concerning prior denials can serve to highlight potential areas of concern in the application review process. *See Movie & Video World,* 723 F.Supp. at 704 (provision requiring disclosure of the status of prior licenses under the ordinance was reasonably related to the stated purpose and enforcement of the ordinance); *Ellwest Stereo Theater,* 718 F.Supp. at 1567 (required disclosure of whether applicant had previously operated an adult-oriented establishment or similar business allowed police department to determine whether applicant operated his former business in compliance with the ordinance, which was relevant to the consideration of whether to grant or deny a license; "this disclosure requirement bears a substantial relationship to a compelling government interest

which justifies this slight intrusion on the applicant's First Amendment rights").

Matters concerning licenses issued by other municipalities may or may not be relevant to Chapter 98 licenses, depending upon how similar the relevant provisions of the other ordinance are to Chapter 98 and the factual circumstances surrounding the denial, suspension or revocation of the other license. That is a matter to be decided on a case-by-case basis, however, and I find that this disclosure requirement is constitutional on its face.

For the reasons stated concerning shareholder disclosure, I find that information concerning whether an applicant ever held stock in a corporation whose license was denied, suspended or revoked is irrelevant to whether the applicant is likely to operate his business in compliance with the Ordinance, and I therefore find that disclosure requirement to be unconstitutional. The applicant may be required to disclose whether he was an officer or director of such a corporation, however, since in that capacity he may have had some responsibility for the events or conditions that led to the action taken against the sexually oriented business.

I also find §§ 98–5(D)(5) and 98–6(D)(3) to be constitutional. Whether the applicant currently holds any licenses under Chapter 98 or other similar chapters from other municipalities will also further the City's substantial interest in monitoring a licensee's compliance with the Ordinance and other laws or regulations relating to adult businesses.

Information about the classification of license for which the applicant is filing (§ 98–5(D)(6)) and the location, general description, and telephone number (if any) of the proposed sexually oriented business (§ 98–5(D)(7)) are of obvious significance and relevance, do not significantly intrude on the applicant's rights, and are reason-

ably related to the City's interests. Accordingly, these provisions are constitutional. *Schultz*, 228 F.3d at 852.

 Sections 98–5(D)(8), (9) and (10), which relate to sexually oriented business license applications, require disclosure of certain information purportedly relating to the identity of the applicant: the applicant's mailing address and residential address (§ 98–5(D)(8)); four two-by-three-inch color photographs of the applicant's face taken within the previous thirty days (§ 98–5(D)(9)); and the applicant's driver's license number, Social Security number, and state or federally issued tax identification number (§ 98–5(D)(10)). Sections 98–6(C), which applies to manager or employee license applications, contains similar requirements: the applicant's height, weight, hair color and eye color (§ 98–6(C)(3)); the applicant's residence address and telephone number (§ 98–6(C)(4)); the applicant's business address and telephone number (§ 98–6(C)(5)); the date, issuing state and number of the applicant's driver's license and "other identification card information" (§ 98–6(C)(6)); and the applicant's Social Security number (§ 98–6(C)(7)). Section 98–6(D)(1) also requires four recent color photographs of the applicant.

In *Schultz*, the Seventh Circuit, though upholding required disclosures of the applicant's name, proof of age, and identifying personal data, invalidated the required production of a residential address, recent color photograph, Social Security number, fingerprints, tax identification number, and driver's license information, all of which the court stated was "redundant and unnecessary" for the city's stated purpose to combat the adverse secondary effects of adult uses on the community. 228 F.3d at 836, 852. The court held that required disclosure of these items "serve[d] 'no purpose other than harassment,' because it

[wa]s not narrowly tailored to the government's interests in the time, place or manner of adult entertainment." *Id.* at 852 (quoting *Genusa*, 619 F.2d at 1217).

The court in *Ellwest Stereo Theater*, 718 F.Supp. 1553, also invalidated a provision requiring that the applicant provide, *inter alia*, two photographs of himself, stating:

> This is not a license, such as a driver's license, which is issued to an individual, and which contains a picture of the individual, as well as a description of his or her height, weight, hair and eye color so that the person carrying the license can be identified as the licensee. A license to operate an adult business can be issued to an individual, a partnership or a corporation. In addition, the person or persons actually managing the business on a day-to-day basis may be different from the person or entity to whom the license is issued. Accordingly, a person enforcing this ordinance may be called upon to determine whether an establishment has a valid and proper license but will not be called upon to determine whether the person physically at the establishment is the licensee. Therefore, photographs of the applicant ... are not necessary for the issuance of the license or the administration of the ordinance. Therefore, these requirements constitute an unconstitutional infringement on the plaintiffs' First Amendment rights.

*Id.* at 1568–69. *See also Suburban Video*, 694 F.Supp. at 592 (invalidating requirements that applicant provide, *inter alia*, residential address, information concerning physical appearance, and two portrait photographs of applicant).

I agree with the reasoning of these cases, particularly insofar as *business* (as opposed to manager or employee) licenses are concerned. Certainly the City has a legitimate interest in knowing to whom the

license is issued and in being able to identify the licensee. To that end, a mailing address is certainly an important and legitimately required piece of information. Similarly, Social Security numbers are one of the most commonly used means of verifying persons' identities today, and I also uphold that requirement.

With respect to sexually oriented business license applications, the other items do not serve any purpose reasonably related to the City's substantial interests. Providing the applicant's name and Social Security number will adequately serve the City's interests in identifying the licensee, and requiring these multiple, redundant items is simply overkill. Except for § 98–5(D)(8) and (10)'s requirements of the applicant's mailing address and Social Security number, then, these provisions are unconstitutional.

 I believe that different considerations apply to manager and employee licenses, however, and that the City can constitutionally impose somewhat broader requirements in that regard. For one thing, as stated, the City has a legitimate and substantial interest in ensuring that minors are not allowed to work at, or even be on the premises of, sexually oriented businesses. The City also has an interest in seeing to it that persons who, for example, have been convicted of prostitution-related offenses do not perform at adult cabarets, in order to combat that particular secondary effect of sexually oriented businesses. It could therefore be important to be able to identify persons working at such establishments, to make sure that they are indeed properly licensed to work there. The less identifying information provided by the applicant, the greater the potential for abuse, if, for instance, the actual licensee gives his or her license to another, unlicensed, person to use.

In view of these considerations, I uphold the requirements that the applicant provide his height, weight, hair color and eye color (§ 98–6(C)(3)), Social Security number (§ 98–6(C)(7)), and four photographs of the applicant's face (§ 98–6(D)(1)). *Ellwest*, 718 F.Supp. at 1574 ("a person charged with enforcing this ordinance may be called upon to determine whether the entertainer or employee carrying the permit is in fact the person to whom the permit was issued. Therefore, the Court finds that the requirement that an entertainer or employee applying for a permit provide information regarding his or her height, weight, hair and eye color, as well as photographs, is necessary for the physical process of issuing a permit and the administration of the ordinance"). I also find constitutional the requirement of the applicant's business address and telephone number (§ 98–6(C)(5)), but only if that requirement is applicable; the applicant cannot be required to provide information that does not exist, and should not be penalized if he has no business address or telephone.

 I find unconstitutional, however, the requirements of the applicant's residence address and telephone number (§ 98–6(C)(4)), and of the date, issuing state and number of the applicant's driver's license and "other identification card information" (§ 98–6(C)(6)). These requirements are intrusive and bear little if any relevance to any substantial government interest. *N.W. Enter., Inc. v. City of Houston*, 27 F.Supp.2d 754, 841 (S.D.Tex. 1998) ("the City has indicated no reason why it needs managers' and entertainers' phone numbers and home addresses"). The requirement of "other identification card information" is also impermissibly vague.

Plaintiffs also challenge the requirement that the application be submitted under oath. This requirement is not found in the Ordinance itself, but in § 68–3 of the

Rochester Municipal Code, which states: "Applications for all licenses or permits shall be made to the City Clerk unless otherwise provided in this Code. Applications shall be made in writing and upon forms prescribed by the issuing authority and shall be verified by the applicant."

The only authority cited by plaintiffs in support of their assertion that this requirement is invalid is the Seventh Circuit's decision in *Genusa,* 619 F.2d 1203. In *Genusa,* however, the court held only that "requiring the individual officers, directors, and stockholders to file separate statements or applications under oath ... [wa]s an unjustified prior restraint and an invasion of privacy." *Id.* at 1217. The court therefore struck down the disclosure requirements as to officers, directors, and stockholders of corporate applicants. The court, then, was troubled not by the fact that the applications had to be submitted under oath, but by the classes of persons required to submit applications in the first place. *Genusa* therefore does not support plaintiff's position in this regard.

I find that the oath requirement is reasonably related to the City's legitimate and substantial interest in encouraging applicants to be truthful when filling out their applications. Certainly plaintiffs cannot claim that they have a right to submit false information, or that this requirement somehow harms them. In short, this provision seems innocuous and does not infringe upon plaintiffs' rights.

**D. Constitutionality of the Ordinance– Additional Regulations for Licensees and Managers**

Section 98–22 of the Ordinance sets forth a number of additional regulations applicable to licensees and managers of sexually oriented businesses. Most of these are not challenged by plaintiffs, and are unobjectionable, inasmuch as they simply prohibit licensees and managers from allowing or permitting criminal activities, such as the sale of illegal drugs (§ 98–22(A)(3)), prostitution (§ 98–22(A)(4)), and illegal consumption of alcohol (§ 98–22(A)(8)), to take place on the premises of a sexually oriented business. Other provisions concerning matters such as noise levels (§ 98–22(A)(11)), the presence of animals (§ 98–22(A)(12)), and the posting of the establishment's license in a conspicuous place (§ 98–22(A)(13)), are similarly inoffensive.

Two of these subsections, however, are unconstitutional: § 98–22(A)(1), which prohibits licensees and managers from "[a]llowing or permit[ting] persons to appear or act on the premises of the sexually oriented business in violation of the regulations set forth in Section 98–21"; and § 98–22(A)(6), which prohibits licensees and managers from "[a]llowing or permit[ting] any specified sexual activities to occur in or on the premises of the sexually oriented business." Section 98–21 contains the regulations of conduct in or on the premises of sexually oriented businesses, one of which, the prohibition of specified sexual activities, I have already found unconstitutional.[14] Therefore, to the extent that §§ 98–22(A)(1) and (A)(6) prohibit licensees and managers from allowing or permitting any specified sexual activities to occur in or on the premises of the sexually oriented business, those two sections are unconstitutional as well.

**E. Severability**

The court having found the Ordinance to be unconstitutional in a number

---

**14.** I note that § 98–22(A)(6) is therefore redundant, since § 98–21(A) provides that "[n]o person in or on the premises of a sexually oriented business shall engage in any specified sexual activities." Any violation of § 98–22(A)(6) would therefore necessarily be a violation of § 98–22(A)(1) as well.

of respects, the next issue is whether the constitutional provisions of the Ordinance are severable from those that the court has invalidated.

Whether an invalid portion of a local ordinance can be severed from the valid portions so that the remainder of the statute can be preserved is a question of state law. *City of Lakewood,* 486 U.S. at 772, 108 S.Ct. 2138; *see also Vermont Right to Life Committee, Inc. v. Sorrell,* 221 F.3d 376, 389 (2d Cir.2000); *Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock,* 93 F.3d 68, 72 (2d Cir.1996). Under New York law, "a court should refrain from invalidating an entire statute when only portions of it are objectionable." *National Adver. Co. v. Town of Niagara,* 942 F.2d 145, 148 (2d Cir.1991) (citing *People ex rel. Alpha Portland Cement Co. v. Knapp,* 230 N.Y. 48, 60–61, 129 N.E. 202 (1920), *cert. denied,* 256 U.S. 702, 41 S.Ct. 624, 65 L.Ed. 1179 (1921)). Although the presence of a severability clause is not dispositive, "[t]he preference for severance is particularly strong when the law contains a severability clause." *Id.*

"Courts that have refused to sever a statute typically have done so when 'the balance of the legislation is incapable of functioning independently [because] the valid and invalid provisions are so intertwined.'" *801 Conklin Street Ltd.,* 38 F.Supp.2d at 245 (quoting *National Adver. Co.,* 942 F.2d at 148 (finding sign ordinance unconstitutional and unsuited for severance because dissociating eleven provisions would leave large gaps in the ordinance, notwithstanding the general severance provision)); *see also New York State Superfund Coalition, Inc. v. New York State Dep't of Envtl. Conservation,* 75 N.Y.2d 88, 94, 550 N.Y.S.2d 879, 550 N.E.2d 155 (1989) (judicial excision is inappropriate where the potentially severed section is a core part of, and interwoven

inextricably with, the entire regulatory scheme).

The Ordinance at issue here does have a severability clause. Section 98–26 provides that "[i]f any section, subsection, or clause of this chapter shall be deemed to be unconstitutional or otherwise invalid, the validity of the remaining sections, subsections, and clauses shall not be affected." In addition, I do not believe that the unconstitutional portions of the Ordinance are so intertwined with the constitutional provisions as to render the balance incapable of functioning independently. *National Adver. Co.,* 942 F.2d at 148; *B & V Greene Inc. v. City of Albany,* No. 99–CV–921, 2000 WL 1876426 *6 (N.D.N.Y. Dec.18, 2000); *cf. Nightclub Mgmt., Ltd. v. City of Cannon Falls,* 95 F.Supp.2d 1027, 1038 (D.Minn.2000) ("The problem with this severability clause, however, is that the Court has not determined that a particular section or clause is invalid; rather, the Court has determined that the ordinance as a whole is invalid").

## CONCLUSION

Plaintiffs' motions for a preliminary injunction in *Brownell v. City of Rochester, New York,* 00–CV–6597, *Zicari v. City of Rochester, New York,* 00–CV–6598, and *S.J.G. of Rochester, Inc. v. City of Rochester, New York,* 00–CV–6012 (each Docket Item 2), are granted in part and denied in part. Defendant is hereby enjoined from enforcing the following sections of Ordinance No.2000–300, until further order of the court:

98–5(C) (requiring that each individual with 20% or greater interest in business sign license application and qualify for license);

98–5(D)(1)(c) (requiring disclosure of information concerning names of all principal shareholders of corporate applicant);

98–5(D)(3) (requiring disclosure of whether applicant has been convicted of a specified criminal activity);

98–5(D)(4) (requiring disclosure of whether applicant has had previous license denied, suspended or revoked);

98–5(D)(8) (requiring applicant to provide residential address);

98–5(D)(9) (requiring applicant to provide four photographs of applicant's face);

98–5(D)(10) (requiring applicant to provide driver's license number and state or federally issued tax identification number);

98–6(C)(2) (requiring applicant to state place of birth);

98–6(C)(4) (requiring applicant to state residential address and telephone number);

98–6(C)(6) (requiring applicant to provide date, issuing state and number of driver's license and other identification card information);

98–6(D)(2) (requiring disclosure of whether applicant has had previous license denied, suspended or revoked);

98–6(D)(4) (requiring disclosure of whether applicant has been convicted of a specified criminal activity);

98–9(B)(3) (providing for denial if applicant has been convicted of specified criminal activity);

98–9(B)(6) (providing for denial if applicant has had license denied within one year of date of application);

98–9(D) (providing that when license is denied, applicant shall not be issued a license for one year from date of denial);

98–10(A)(3) (providing for denial if applicant has been convicted of specified criminal activity);

98–10(A)(5) (providing for denial if applicant has had license denied within one year of date of application);

98–10(C) (providing that when license is denied, applicant shall not be issued a license for one year from date of denial);

98–21(A) (prohibiting specified sexual activities in or on premises of sexually oriented business);

98–22(A)(1) (prohibiting licensees and managers from allowing persons to violate § 98–21(A)); and

98–22(A)(6) (prohibiting licensees and managers from allowing specified sexual activities to occur in or on premises of sexually oriented businesses).

The above-cited provisions are severed from the Ordinance, the balance of which remains enforceable.

IT IS SO ORDERED.